**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1608

ANDREW ADAMS,

Plaintiff – Appellant,

v.

ANNE ARUNDEL COUNTY PUBLIC SCHOOLS,

Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore.    Marvin J. Garbis, Senior District Judge.  (1:11-cv-02876-MJG)

Argued:  May 13, 2015                     Decided:  June 15, 2015

Before TRAXLER, Chief Judge, and WILKINSON and FLOYD, Circuit Judges.

Affirmed by published opinion.   Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Judge Floyd joined.

Joyce E. Smithey, RIFKIN, LIVINGSTON, LEVITAN & SILVER, LLC, Annapolis, Maryland, for Appellant.   Jay Creech, ANNE ARUNDEL COUNTY OFFICE OF LAW, Annapolis, Maryland, for Appellee.

WILKINSON, Circuit Judge:

Andrew Adams contends that the Board of Education of Anne Arundel County violated his rights under the Family and Medical Leave Act of 1993 ("FMLA") and the Americans with Disabilities Act of 1990 ("ADA"). His allegations include interference with his medical leaves, retaliation for taking those leaves, discrimination and retaliation on the basis of his disability, and a failure to accommodate his condition. We find no merit to these related claims and affirm the judgment of the district court.

I.

A.

On January 19, 2010, Adams was involved in an incident with a student in a hallway at MacArthur Middle School in Fort Meade, Maryland, where he was an assistant principal. Although witness accounts differed significantly, the student initially claimed that Adams "grabbed [her] by the arms, shook her, and pinned her against a wall." J.A. 145. As a result of the incident, Child Protective Services ("CPS") launched a child abuse investigation, and the matter was also referred to the school Board's Employee Case Management committee. CPS acts to prevent and investigate incidences of child abuse under the auspices of the Department of Social Services ("DSS"), whereas the Board's Employee Case Management committee has as its focus conduct

2

detrimental to the proper functioning of the school system. Adams was temporarily reassigned from MacArthur in the meantime.

On February 24, Adams met with Board investigators. Adams contends that at that meeting he was shown a document stating he was completely cleared of all charges. The Board denies Adams was shown any such document and claims its independent investigation, which focused on school district policy violations, continued on a parallel track. In all events, the Board transferred Adams back to MacArthur on February 25. That same day, however, he went on medical leave upon the recommendation of Dr. Kim Bondurant, an internal medicine specialist, because he suffered from stress, anxiety, and high blood pressure, presumably related to the January 19 incident and the child abuse allegation. Adams returned to MacArthur on March 3, but had a panic attack, during which he claims he was berated by Principal Reginald Farrare. Adams took a second medical leave, and Dr. Bondurant referred him to a psychiatrist, Dr. Lawrence Adler. Adams claims that when he came back to work on March 8, Farrare again berated him, this time in front of other staff.

Two weeks later, Adams began his third and final medical leave after Dr. Adler diagnosed him with acute stress disorder. Dr. Adler informed the Board that, when Adams returned from leave, "he will require assignment to another school," because

3

being at MacArthur could spur "panic attacks and other manifestations of his illness." J.A. 36. Dr. Adler later updated the diagnosis to post-traumatic stress disorder, as reflected in the FMLA paperwork that he submitted on May 5. The Board required Adams to attend three sessions during the summer with a specialist of its choosing, psychologist Dr. Anthony Wolff. Dr. Wolff cleared Adams to work on July 28.

The Board's investigative process continued while Adams was on that extended leave. The Board sent a letter to Adams on April 12, notifying him that a pre-disciplinary conference had been scheduled for May 6. The meeting was delayed by four days so that Adams's attorney could attend. Two weeks after the conference, Adams received a letter from the Board formally reprimanding him for "engag[ing] in physical contact by using a technique that escalated a situation that could have been handled differently." J.A. 584.

Adams began working at a new school, J. Albert Adams Academy ("JAA"), on August 4. The Board had first informed Adams in early June that it intended to transfer him to JAA. However, Adams agrees that the transfer did not occur in practice until August, as he was on leave until late July. In the spring, Dr. Adler had recommended a transfer, and Dr. Wolff later agreed that Adams "would best be assigned to a supportive, lower-stress school environment." J.A. 194. "Mr. Adams," Dr. Wolff stated,

4

"is not averse to the possibility of being assigned to a specialized program such as the J. Albert Adams Academy, which has been mentioned as a possibility." J.A. 194.

The student population of JAA, a specialized middle school for children with behavioral issues, used to reach 120, but now is capped at 80. In contrast, MacArthur has more than 1,000 students and a less favorable staff-to-student ratio. In accordance with a union contract, Adams's salary remained the same for two years and then was reduced by less than one percent because of JAA's smaller size. JAA employees are also ineligible for certain discretionary bonuses available at other schools. Adams has reportedly excelled at JAA. He has received exceptional performance reviews, has served as acting principal for a month, and has not been subject to any further discipline. He has not requested a transfer from JAA.

B.

Adams filed this lawsuit in Maryland state court, and the Board removed the case to federal court. Adams alleged various violations of the FMLA, the ADA, Title VII of the Civil Rights Act of 1964, and Maryland state law. After allowing Adams to amend his initial complaint, the district court dismissed all of the allegations in the Second Amended Complaint for failure to state a claim, except for Adams's FMLA interference and retaliation claims and his ADA discrimination and retaliation

5

claims. See J.A. 61-126. After discovery, the district court granted the Board's motion for summary judgment on those remaining claims. See J.A. 625-55.

On appeal, Adams presses his various FMLA and ADA claims, all of which arise from the same set of operative facts. We review de novo both the grant of a motion to dismiss for failure to state a claim and the grant of a motion for summary judgment. Bland v. Roberts, 730 F.3d 368, 373 (4th Cir. 2013); E.I. Du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 400 (4th Cir. 2011). Under our summary judgment standard, of course, the facts are generally viewed in the light most favorable to the plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). Summary judgment is appropriate only if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). For the following reasons, we affirm the judgment.

II.

Adams contends that the Board both interfered with his FMLA rights and retaliated against him for taking medical leave.

A.

The FMLA grants employees the prescriptive right to take up "to a total of 12 workweeks of leave during any 12-month period" when, inter alia, an employee is burdened with "a serious health

6

condition that makes the employee unable to perform" his job. 29 U.S.C. § 2612(a)(1)(D). When returning from FMLA leave, an employee is also entitled to be restored to his previous position or an equivalent position, so long as he would have retained that position or an equivalent one absent the taking of leave. Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546-47 (4th Cir. 2006) (citing 29 U.S.C. § 2614(a)). That is, there is "no absolute right to restoration to a prior employment position." Id. at 549. Nonetheless, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1).

To make out an "interference" claim under the FMLA, an employee must thus demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (citing 29 U.S.C. § 2617(a)(1)); Wonasue v. Univ. of Md. Alumni Ass'n, 984 F. Supp. 2d 480, 495 (D. Md. 2013).

We begin by noting one salient fact: Adams was not denied FMLA leave. In fact, he took three separate medical leaves totaling well over twelve weeks. The Supreme Court has observed that the "purpose of [an interference claim] is to permit a court to inquire into matters such as whether the employee would

7

have exercised his or her FMLA rights in the absence of the employer's actions." Ragsdale, 535 U.S. at 91. Adams has not suggested that the Board denied him any FMLA leave he requested. On the contrary, Adams received more than the statutorily guaranteed amount.

Nevertheless, Adams argues that the Board interfered with his leave in a variety of ways that stopped short of actually denying him leave. In particular, he asserts that the Board took adverse employment actions against him, which interfered with his FMLA rights by discouraging the taking of leave. See 29 C.F.R. § 825.220(b) ("'Interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

Adams first objects that the Board required him to submit to three unnecessary examinations by a Board-chosen specialist. But the FMLA and the applicable regulation explicitly allow employers to seek a second opinion and even a third, if the first two opinions conflict. 29 U.S.C. § 2613(c), (d); 29 C.F.R. § 825.307(b), (c). Such medical opinions allow an employer to verify the claimed medical condition, to assess how long the employee might be out of work, and to fashion the best environment for the employee upon his return to the workplace.

8

The regulation concerning the "authenticity" of the initial certification by a medical professional, 29 C.F.R. § 825.307(a), is not applicable here. Employers may order a second or third medical evaluation out of concern that the original certification of a serious medical condition is <u>invalid</u>, not that it is <u>inauthentic</u>. <u>See</u> 29 U.S.C. § 2613(c) (allowing a second evaluation where "the employer has reason to doubt the validity of the certification"). Employers are entitled to seek a second opinion regardless of whether the certification notice proffered by the employee is real or not. In requiring Adams to attend the sessions with Dr. Wolff, the Board simply exercised its statutory right to seek another professional medical opinion.

Second, Adams argues that the Board's pre-disciplinary conference interfered with his leave by forcing him to "work." Appellant's Br. at 32. In certain circumstances required meetings may unlawfully interrupt an employee's leave. Here, however, the one-time conference was a legitimate piece of an ongoing investigation into the January 19 incident between Adams and the student. Adams argues more broadly that the Board's continued disciplinary investigation ran contrary to the understanding reached at the February 24 meeting with school officials, during which they allegedly indicated the entire matter had been wrapped up. He also submits several deposition

9

statements from MacArthur staff to the effect that his reinstatement at MacArthur indicated everything was fine. See J.A. 481 (statement of Reginald Farrare) ("When he returned to school it signified to me that he had been cleared of those allegations. . . . [S]omeone informed me that he had been cleared of the allegations . . . ."); J.A. 592 (statement of Deanna Natarian) ("[U]pon his return I assumed everything was fine. He wouldn't have returned if it wasn't."). The staff members had not been at the February 24 meeting and relayed general information apparently conveyed by unspecified other persons.

For several reasons, we do not believe Adams's proffers suffice to create an issue of triable fact as to the events surrounding the February 24 meeting, or in a larger sense the Board's continuation of its own investigation. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (finding summary judgment proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case"). Although the DSS committee by early February had cleared Adams in its child abuse investigation, there is little evidence that the Board in some way closed and then reopened its own investigation into whether Adams had violated school district

10

policies, much less that its actions had anything to do with Adams's FMLA leave.

Indeed, the evidence overwhelmingly points to the contrary conclusion that the Board's separate investigation into school district policy violations was continuous. The only document in the record that resembles what Adams claims was a fully exculpatory resolution of the January 19 incident is the February 4 decision by a five-member committee of the DSS to "rule[] out" the child abuse allegation. J.A. 604-05. By contrast, the Employee Case Management log shows that the Board's own investigation report was not completed on February 24, the date on which Adams claims the investigation was closed. In fact, the school district's interview of Adams about the incident was not even scheduled until that same day, because DSS had just completed and finalized its investigation of the child abuse allegations and the school district investigation could thereafter proceed unfettered. The draft report was not finished until March 23, and the report was not finalized until April 8. The Board then notified Adams of the pre-disciplinary conference by letter. The conference was postponed for several days so that Adams's counsel could attend.

It is surely true that the investigative processes of any institution are open to abuse, but the record here points to a standard procedure during which due process was accorded to

11

Adams every step along the way. Adams does not dispute that the Board was entitled to conduct its own investigation into the January 19 incident. Indeed, school districts must often engage in investigations like this one or else face accusations and lawsuits for not looking promptly into allegations of improper teacher contact with students or violations of school district policies. The pre-disciplinary conference was part of the investigatory and disciplinary process, which Adams has not adequately linked to his ample FMLA leaves, and seeking the participation of Adams and his attorney in that process did not constitute an impermissible interference with Adams's FMLA leave. And Adams never objected or sought a continuance he did not get.

Third, Adams asserts that Farrare's alleged verbal "attacks" and the written reprimand constituted adverse employment actions. Appellant's Br. at 11. But however bad the relationship between Adams and Farrare, Adams cannot demonstrate that these verbal and written reprimands in fact discouraged him from taking FMLA leave. Indeed, Adams began his second medical leave the same day as the first alleged verbal attack. Nor did the written reprimand inhibit Adams's final medical leave -- he did not return to work until more than two months after the reprimand was issued.

Regardless, neither the written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline. See, e.g., Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 754-55 (4th Cir. 1996); Jeffers v. Thompson, 264 F. Supp. 2d 314, 330 (D. Md. 2003). The written reprimand, in particular, was the final step in the Board's legitimate ongoing investigation. These incidents were what the Board said they were -- reprimands, not signposts on a predetermined path to a true adverse employment action. In fact, Adams has received excellent reviews of his performance since returning from the third and final FMLA leave.

B.

Adams also contends that the Board retaliated against him for exercising his FMLA rights. See 29 U.S.C. § 2615(a)(2) (making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA); see also 29 C.F.R. § 825.220(c) (noting that "employers cannot use the taking of FMLA leave as a negative factor in employment actions").

Retaliation claims brought under the FMLA are analogous to those brought under Title VII. Laing v. Federal Express Corp., 703 F.3d 713, 717 (4th Cir. 2013); Yashenko, 446 F.3d at 550-51. Plaintiff must prove three elements to establish a prima facie case of retaliation: (1) "she engaged in a protected activity";

13

(2) "her employer took an adverse employment action against her"; and (3) "there was a causal link between the two events." Boyer-Liberto v. Fontainebleau Corp., No. 13-1473, slip op. at 36 (4th Cir. 2015) (en banc) (quotation marks omitted). If the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual. See Laing, 703 F.3d at 717, 719 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).

Many of the Board's actions here were simply not retaliatory. As noted above, the Board's disciplinary investigation into Adams's conduct was never concluded, and thus it could not have been reopened in order to retaliate against Adams. The Board's review, including the pre-disciplinary conference and the written reprimand, observed due process requirements. Other Board decisions fail to qualify as adverse employment actions. The eventual result of the Board's investigation -- the reprimand letter -- did not adversely affect Adams's employment position or his pay and benefits. Similarly, Farrare's verbal reprimands did not adversely affect Adams's employment. Although the Board required the medical examinations in reaction to Adams's taking of FMLA leave, such a request for a second medical opinion is expressly allowed under the applicable statutory and regulatory provisions.

14

Nor was Adams's transfer from MacArthur to JAA in retaliation for his exercise of FMLA rights. Crucially, both Dr. Adler and Dr. Wolff recommended that Adams be transferred to a different and less stressful school, and Adams reportedly was "not averse to the possibility of being assigned to" JAA. J.A. 194. The Board effectuated the transfer promptly -- Adams's first day at JAA came merely a week after Dr. Wolff had cleared him as fit to work. Adams's salary remained at the same level for two years before being reduced by less than one percent, and as a JAA employee he was no longer eligible for some discretionary bonuses. The salary reduction was mandated by the union contract because JAA has a much smaller student population than MacArthur.

Although JAA is a school for children with behavioral issues, it has no more than ten percent the number of students as MacArthur and also has a more favorable staff-to-student ratio. Moreover, Adams seems to have done well at JAA. He has received superb reviews and has not requested a transfer from JAA, despite having the opportunity to do so.

There simply is no retaliatory animus at work here. By transferring Adams to JAA in a timely manner, on the recommendations of both Dr. Adler and Dr. Wolff, to a school with fewer students and more staff per student, the Board essentially fashioned an accommodation for his disability. See

15

infra Section III.B. Such reasonable accommodations under the ADA are not likely to be retaliatory under the FMLA, and they were plainly not under the circumstances presented here.

## III.

Adams mounts a separate set of claims under the ADA. He asserts that the Board discriminated and retaliated against him based on his disability and also failed to accommodate his condition.

## A.

The ADA forbids employers from discriminating against persons with disabilities. 42 U.S.C. § 12112(a)-(b). The Act also bars employers from retaliating against employees for seeking these statutory protections. Id. § 12203(a)-(b). Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," id. § 12101(b)(1), through "clear, strong, consistent, enforceable standards," id. § 12101(b)(2). A "qualified individual" with a disability under the ADA is someone "who, with or without reasonable accommodation, can perform the essential functions" of the job. Id. § 12111(8). The Act contains a "detailed description of the practices that would constitute the prohibited discrimination," and it "speaks in clear and direct terms to the question of

16

retaliation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2531 (2013).

In Adams's view, the Board's alleged ADA violations included Principal Farrare's verbal "attacks," the Board's continued investigation of the student hallway incident, the written reprimand, and the mandated medical examinations. In addition, Adams argues that the Board retaliated against him for requesting a disability accommodation. The Board's retaliatory measures, he asserts, included the written reprimand, the medical examinations, and the reduced pay at JAA.

Adams's discrimination and retaliation claims at this stage are subject to similar though not identical legal standards. Compare Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001) (discrimination), with A Soc'y Without a Name v. Virginia, 655 F.3d 342, 350 (4th Cir. 2011) (retaliation). These two tests share a common element, however: the plaintiff must have suffered an adverse employment action of some kind. See Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 173-74 (2011); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63-64 (2006).

The requirement of an adverse employment action seeks to differentiate those harms that work a "significant" detriment on employees from those that are relatively insubstantial or "trivial." White, 548 U.S. at 68. As the Supreme Court has

17

explained in the analogous Title VII context: "The substantive [discrimination] provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." Id. at 63 (emphasis added). Pointedly, the antiretaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee." Id. at 57. The analysis depends on the particular circumstances of the case. Id. at 71. All the tests, however, require that there be an adverse employment action, which denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it. See Thompson, 562 U.S. at 173-74; White, 548 U.S. at 63-64.

Many of the harms alleged by Adams do not rise to the level of an adverse employment action. It is surely true that Farrare and the Board did things that Adams personally did not like. But dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment.

Moreover, reprimands and poor performance evaluations occur with some frequency in the workplace. While the analysis of them is necessarily dependent on the circumstances, see White, 548 U.S. at 69, they are much less likely to involve adverse

18

employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent. Here, Adams has failed to link such matters as the upbraiding by Farrare, the Board's pursuit of its obligation to investigate the hallway incident, and the statutorily permitted medical examinations to some material change in the conditions of his employment. See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). Even assuming the unlikely presence of an unlawful discriminatory intent for any of the above actions, they did not cross the threshold that courts have traditionally required for a personnel matter to be actionable. See, e.g., Cepada v. Bd. of Educ., 974 F. Supp. 2d 772, 788 & n.51 (D. Md. 2013) (yelling by an assistant principal at a teacher insufficient); Jeffers v. Thompson, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (an oral or written reprimand, without some actual injury, does not qualify); Settle v. Balt. Cnty., 34 F. Supp. 2d 969, 992 (D. Md. 1999) ("inconvenience" or "emotional anxiety" resulting from "a disciplinary investigation [that] is reasonably rooted in articulable facts justifying such an investigation" not sufficient), aff'd sub nom. Harris v. Earp, 203 F.3d 820 (4th Cir. 2000), and Settle v. Balt. Cnty. Police Dep't, 203 F.3d 822 (4th Cir. 2000).

19

B.

The transfer of Adams from MacArthur to JAA belongs in a rather different category from that of the actions discussed above. Adams claims here that the Board failed to provide a reasonable accommodation for his disability. In particular, he contends that the Board "made no effort" to reassign him "to a less stressful school where he would not suffer a reduction in pay," and that the Board did not transfer him until four months after he had initially requested an accommodation. Appellant's Br. at 46.

The ADA forbids an employer from discriminating against an individual with a disability who, with "reasonable accommodation, can perform the essential functions" of the position. 42 U.S.C. § 12111(8); see US Airways, Inc. v. Barnett, 535 U.S. 391, 393 (2002); Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001). An employer that fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" has engaged in impermissible discrimination, unless the employer can show that the accommodation imposed an "undue hardship" upon its operations. 42 U.S.C. § 12112(b)(5)(A). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position," and other appropriate changes. Id. § 12111(9)(B).

20

Here, the Board did not outright deny Adams's requests to accommodate his disability. Rather, Adams questions the adequacy of the Board's efforts. We think, however, that the Board's accommodations were plainly reasonable. Many of the justifications are similar to those already touched upon in our discussion of Adams's FMLA claims. See supra Part II.

First, Adams's transfer to JAA was consistent with the recommendations of the doctors who had examined him. Adams's psychiatrist, Dr. Adler, emphasized that Adams "must be reassigned to another location," away from the "site of psychological trauma." J.A. 38-39. The Board's psychologist, Dr. Wolff, agreed that Adams "would best be assigned to a supportive, lower-stress school environment." J.A. 194. Dr. Wolff noted that Adams was "not averse to the possibility of being assigned to a specialized program such as the J. Albert Adams Academy, which has been mentioned as a possibility." J.A. 194. The professional advice of both doctors, in short, supports the basic reasonableness of the Board's reassignment decision.

Second, the Board acted on Adams's request in a timely manner. Adams requested an accommodation in late March. He gave the Board a note from Dr. Adler stating that he "require[d] temporary medical leave," and that, "[w]hen he is stabilized, he will require reassignment to another school." J.A. 36 (emphasis added). The Board informed Adams of the reassignment to JAA on

21

June 2, and after his extended leave ended on July 28, he began work there on August 4. The Board addressed this task during his leave and executed the reassignment within a week of his return. Under the circumstances, that seems a quite reasonable interval.

Third, in light of Adams's disability, the Board sensibly sought a "less stressful environment" for him. J.A. 202. Regardless of whether comparable positions at other schools were available at the time, the Board's reassignment decision was based not only on the advice of medical professionals, but also on the particular characteristics of JAA, after consultation with Adams. As noted earlier, the Board moved him to a school with a far smaller student population (by a factor of ten), a more favorable staff-to-student ratio, and a sizable support staff. The Board appears to have weighed those features in conjunction with the fact that many students at JAA have a history of behavioral problems. An array of legitimate considerations entered into what frankly was for the Board a judgment call. As Dr. Wolff observed, "It is difficult to define what may constitute a lower-stress school environment, given the unpredictable nature of student behavior." J.A. 194.

Fourth, Adams did not object to his reassignment to JAA at the time, and he has not requested a transfer since then. The Board has posted openings for other schools during the interim, but Adams has not asked to leave his position at JAA to work

22

elsewhere. Indeed, as noted, he has thrived there: he has received ratings of "outstanding" on his annual evaluations and briefly served as acting principal. Adams does allege that JAA students have threatened him on two occasions since his transfer. Although such behaviors are always troubling, they must be considered in context. Aside from his own affidavit and deposition, Adams has not offered any evidence to bolster his argument that JAA is an equally or more stressful work environment than MacArthur. The record does not specifically indicate what else the Board could have done or where else he would prefer to work. Indeed, Adams has never requested a transfer or had any further work-related medical problems.

Fifth, the eventual decrease in Adams's salary stemmed from a systemwide collective-bargaining agreement. The agreement between the teachers' union and the Board determines salaries on the basis of schools' populations, and JAA has far fewer students than MacArthur. The resulting $1,031 decrease constituted less than one percent of his salary. Moreover, Adams held the same position, assistant principal, at the two schools. For his first two years at JAA, Adams in fact earned the same salary as he had at MacArthur, as stipulated in his transfer letter. It is true that Adams did become ineligible for certain discretionary bonuses awarded at other schools. The fact remains, however, that less stressful jobs may on occasion be

23

less remunerative. That tradeoff does not invalidate the Board's action in these circumstances.

In sum, there is nothing in this entire sequence of events to indicate that the Board's efforts to accommodate Adams were anything but reasonable.

IV.

The FMLA and the ADA impose important obligations on educational, and indeed all, covered employers. What they do not impose, however, are extra statutory obstacles to the investigation of what in other cases might be serious instances of child abuse. Schools have an obligation to safeguard the safety and welfare of those students in their charge. A proper reading of the FMLA and ADA does not impair the ability of school systems to responsibly exercise this duty.

The Board of Education faced a further predicament here. Had it failed or refused to reassign Adams from his positon at MacArthur, its inaction would have courted ADA litigation. That statute, moreover, requires a "reasonable" accommodation, not a perfect one. See 42 U.S.C. §§ 12111(8)-(9), 12112(b)(5)(A)-(B). Hindsight must not underestimate hard choices that employers, in consultation with their employees and medical professionals, confront at the time. The record before us plainly indicates that the Board did what it could to alleviate an unfortunate situation. It should not incur liability for its efforts.

24

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.