**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2083**

ARLENE FRY,

        Plaintiff – Appellant,

    v.

RAND CONSTRUCTION CORPORATION

        Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:17-cv-00878-AJT-TCB)

Argued: December 11, 2019                Decided: July 1, 2020

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Niemeyer joined. Judge Motz wrote a dissenting opinion.

**ARGUED:** Adam Augustine Carter, EMPLOYMENT LAW GROUP, Washington, D.C., for Appellant. James Edward Tysse, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee. **ON BRIEF:** Jeanne Louise Heiser, R. Scott Oswald, Nicholas Woodfield, EMPLOYMENT LAW GROUP, Washington, D.C., for Appellant. Anthony T. Pierce, Nathan J. Oleson, Lide E. Paterno, Erica E. Holland, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee.

RICHARDSON, Circuit Judge:

Arlene Fry alleges her former employer, Rand Construction Corporation, unlawfully fired her for taking leave under the Family Medical Leave Act ("FMLA"). A jury agreed and returned a verdict in Fry's favor. Yet the district court entered judgment for Rand. Fry, according to the district court, failed to present sufficient evidence for a reasonable jury to find that Rand's justification for the termination was false and merely a pretext for retaliation. We agree with the district court and affirm.

## I. Background

### A. Fry's employment at Rand

For more than eight years, Arlene Fry served as an administrative assistant to Linda Rabbitt, Rand's Chief Executive Officer and founder. Among other administrative tasks, Fry coordinated Rabbitt's schedule, emails, and calendar.

In 2016, problems with Fry's performance began to simmer. Among other errors, Fry failed to inform Rabbitt about a change in the schedule for a delivery, failed to check Rabbitt's emails, failed to coordinate with Rabbitt's driver so that he could pick Rabbitt up, and failed to complete an assigned task. *See generally* Appellant's Br. 3 (admitting Fry's employment at Rand was not without "occasional problems"). As a result, Rabbitt expressed repeated concerns about Fry's performance in March, May, July, August, and September 2016. In an email in September 2016, Rabbitt explained that Fry's job "may [well] be in jeopardy" considering her performance problems. J.A. 1263.

Rabbitt's problems with Fry boiled over in early November 2016. According to Rabbitt, Fry almost caused her to miss a meeting with Rand's largest client. Rabbitt

2

immediately complained about the mistake to Fry.  Rabbitt also raised the issue to Rand's Chief Operating Officer, Kurt Haglund, writing that Fry was "making too many mistakes" and Rand would "need to replace her" if she "blew it" on this "critical" task.  J.A. 1264.  Because Fry managed Rabbitt's emails, Fry saw this message as soon as she arrived to work on November 3, 2016.  Fry then approached Haglund before Haglund could meet with Rabbitt.  Haglund explained that he personally did not want to replace Fry, and he believed Rabbitt was just angry and upset.  According to Fry, Rabbitt continued to be "furious" and would not speak to her.  J.A. 443.

Rabbitt later confirmed that Fry had made the mistake.  The next day, Rabbitt listed Fry's positive and negative attributes as an employee (and the negatives outnumbered the positives).  *See* J.A. 1266.  At that time, Rabbitt was "sort of in [her] head just proofing out that [she] just needed to do this.  [She] just needed to replace Arlene Fry as [her] executive assistant."  J.A. 618.  Rabbitt gave the list to Rand's Human Resources Director, Violetta Bazyluk, who understood that Rabbitt "did not want Ms. Fry to be her assistant anymore. [Rabbitt] wanted to get rid of her and be done with this. . . . [E]mployment will be terminated."  J.A. 203–04.  And Rabbitt later called Haglund about Fry's performance, "extremely angry and very frustrated."  J.A. 334.

Less than two weeks later, another incident reinforced Rabbitt's decision to terminate Fry.  On November 15, Rabbitt rushed through traffic for an early-morning meeting in Washington, D.C., only to learn that the meeting had been changed to a conference call.  Rabbitt, angry and embarrassed, blamed Fry for failing to communicate the change.  The ordeal confirmed for Rabbitt that it was "time for us to separate" because

3

Fry was not providing effective help. J.A. 624. Rabbitt spoke with Bazyluk and "reconfirmed that there will be an end to [Fry's] employment." J.A. 205.

After learning that Rabbitt was again furious with her, Fry scheduled an appointment with her doctor. Unknown to both Rabbitt and Rand, Fry had been diagnosed with multiple sclerosis in 2010. Fry had not told Rand about the diagnosis in the six years since she received it. At the appointment two days after her latest error, Fry asked her doctor if she now qualified for "disability." J.A. 650. Fry's doctor said that she lacked the necessary "objective limitation" to be considered disabled. *Id*. The doctor said that he "generally . . . tr[ies] to keep [his] patients as active and working as long as possible. And there was not at that time, in [his] estimation, a significant finding to support disability." J.A. 651. The doctor also had a "[l]ong discussion [with Fry] about medications, changing jobs, stress management[,] etc." J.A. 1463.

Four days after the appointment, Fry informed Rabbitt and Bazyluk about her multiple sclerosis diagnosis and requested two weeks of FMLA leave. Rand approved Fry's request, and Fry's leave started the next week. Fry's doctor did not certify her FMLA leave until about a week and a half after her leave started.

When Fry returned to Rand on December 12, 2016, she was met with harsh comments from Rabbitt. In the weeks before Christmas, other negative confrontations broke out, and Bazyluk told Fry that the relationship with Rabbitt had become "toxic." J.A.

4

Bazyluk then asked Fry if she would be willing to work for Haglund instead of Rabbitt. Fry agreed to change positions and to train Rabbitt's new assistant.[1]

The next day, Fry met with Haglund and Bazyluk. According to Fry, Haglund told her that he "d[id] not have enough work to justify [having] an assistant of [his] own." J.A. 425. Although Haglund and Bazyluk explained that they had tried to find other work for Fry, no one needed anything done. "So [they could] not find a full-time job for her." *Id.* Bazyluk suggested that Fry work for Rabbitt until Rand hired a new assistant. Then Fry could move to a part-time position until her last day at Rand: June 30, 2017.

In early January 2017, Haglund sent Fry a formal letter that explained the reasons for her "departure from the Company" and described the "transition plan" for Fry. J.A. 1134. Several weeks later, Fry emailed Haglund to complain—for the first time—about "the discrimination and retaliation" that she had suffered at Rand. J.A. 1067. She "reject[ed] the company's request [to end her employment] because it is retaliation for my protected leave-taking and my revealing to the company my disability and serious health condition." *Id.* Haglund responded on January 27 to rebut Fry's alleged discrimination and retaliation. Haglund concluded: "We will need to make a final decision as to where to go from here. Your performance in your current position was not satisfactory to

---

[1] Around this time, Rabbitt told Fry, Bazyluk, and Haglund, "Arlene works for me. She works for me. Do you understand?" J.A. 421–23; *see* J.A. 309–10. In context, Rabbitt was complaining about Fry's surprise mid-day absence. Fry had sought to explain that she told others that she had an appointment. But Rabbitt thought telling others was insufficient, as Fry worked for Rabbitt. *See, e.g.*, J.A. 309.

[Rabbitt], and there is currently no open position for which you are qualified and you could transfer." J.A. 1126.

Fry then emailed Haglund, disagreeing "with the vast majority of [his] comments." J.A. 1154. Fry conceded that Rabbitt "was upset with [her] on November 3 for something [she] allegedly did incorrectly." But she claimed Haglund's January 27 email was the first time she learned that Rabbitt's anger "was allegedly because of a mistake in the scheduling of an important conference call." J.A. 1155. Fry also said that, since returning from leave, she had been "met with screaming accusations from [Rabbitt] that [Fry] was lying about [her] leave." *Id.* The next day, Rand officially terminated Fry's employment.

## B. Fry's lawsuit

Fry sued Rand in federal court. Among other claims, Fry alleged that Rand fired her in retaliation for taking FMLA leave. Before trial, Fry moved to admit testimony from Susan Boyle, a former Rand employee terminated in 2008 after working as Rabbitt's executive assistant for seven months. Boyle took leave for six weeks under Rand's non-FMLA medical leave policy to recover from a surgery. When Boyle did not return to work after her leave, she claimed that Rand terminated her, although Rand contended that Boyle resigned. Fry sought to offer Boyle's testimony to show "evidence of [Rand's] intent in terminating [Fry]." J.A. 119. The district court excluded Boyle's testimony under Rule 403 of the Federal Rules of Evidence.

A four-day jury trial began in April 2018. At the end of Fry's case-in-chief, Rand moved for judgment as a matter of law. The district court reserved its ruling until after hearing Rand's evidence, at which point, the district court decided that "the better course

6

[was] to submit the case to the jury," despite the "very substantial issue as to the adequacy of the evidence." J.A. 718. The district court pointed out that it could "actually decide those issues, if necessary, after the verdict." *Id*. The jury rejected Fry's other claims but returned a verdict for Fry on her FMLA claim, awarding her $50,555. Rand renewed its motion for judgment as a matter of law and moved for a new trial.

Notwithstanding the verdict for Fry, the district court granted Rand's motion for judgment as a matter of law. Applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court found that "Fry met her initial burden of making out a *prima facie* case of retaliation." J.A. 948. Next, the district court found that Rand established a legitimate nondiscriminatory reason for terminating Fry: "problems with her job performance that predated her FMLA leave." J.A. 949. And finally, the district court held that Fry "failed to introduce evidence from which a jury could reasonably find that Rand's proffered reason was untrue or a pretext." *Id.* The district court also conditionally granted Rand's motion for a new trial because "the weight of the evidence [was] so heavily in favor of Rand." J.A. 950. Fry then timely filed this appeal, challenging the district court's orders granting motion for judgment as a matter of law and excluding Boyle's testimony.[2] We have jurisdiction under 28 U.S.C. § 1291.

---

[2] Fry does not challenge the district court's conditional grant of a new trial on the FMLA claim. So had Fry prevailed on appeal, a new trial would still have been required.

7

## II. Discussion

### A. The court properly granted judgment as a matter of law on Fry's FMLA claim

We review de novo the district court's grant of a Rule 50(a)(1) motion for judgment as a matter of law. *Myrick v. Prime Insurance Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). In conducting our review, we apply the same standard used for granting summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Under Rule 50, a district court may grant the defendant's motion only when the plaintiff has been fully heard on a claim and the evidence presented, combined with all permissible inferences, does not provide a legally sufficient basis for a reasonable jury to find in the plaintiff's favor. Fed. R. Civ. P. 50(a)(1). "If a verdict in favor of the nonmoving party 'would necessarily be based upon speculation and conjecture,' judgment as a matter of law must be entered in the moving party's favor. However, '[i]f the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied.'" *Fontenot v. Taser International, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013) (quoting *Myrick*, 395 F.3d at 489–90).

#### 1. The burden of proof for FMLA claims

The FMLA provides covered employees with certain rights and protections, including "12 workweeks of leave during any 12-month period" for family-related reasons or for an employee's serious health condition that renders her unable to do her job. 29 U.S.C. § 2612(a)(1). After taking qualified leave, employees are entitled to return to their pre-leave job or an equivalent position. *Id.* § 2614(a)(1)(A)–(B). And an employer may

8

not eliminate any accrued employment benefit when an employee takes qualified leave. *Id.* § 2614(a)(2).

Section 2615 prohibits two kinds of conduct: (1) an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," *id.* § 2615(a)(1); and (2) an employer cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," *id.* § 2615(a)(2). The first prohibition gives rise to "'interference' or 'entitlement' claims." *Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 186 (4th Cir. 2017) (quoting *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006)). The second prohibits retaliation or discrimination for opposing unlawful practices. *See id.*

In both contexts, a plaintiff can either (1) produce direct and indirect evidence of retaliatory animus or (2) "demonstrate intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in *McDonnell Douglas*." *Id.* at 191; *see also Laing v. Federal Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *Yashenko*, 446 F.3d at 550−51. Here, both parties agree that the district court properly proceeded under the latter approach.

The *McDonnell Douglas* framework requires the plaintiff first to establish a prima facie case of FMLA retaliation by proving three elements: "(1) [the plaintiff] engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019) (cleaned up). Then, the burden shifts to the defendant to produce "a

9

legitimate, nonretaliatory reason for taking the employment action at issue." *Id.* Lastly, the plaintiff is given a chance to prove that the employer's explanation was false and a pretext for retaliation. *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015); *see also Diamond v. Colonial Life & Accident Insurance Co.*, 416 F.3d 310, 318–20 (4th Cir. 2005).

While it is clear that Fry relies on the *McDonnell Douglas* framework, it is unclear as a textual matter which subsection of § 2615—if either—provides the basis for her claim that she was retaliated against for taking leave. But since 2006, our Court has held that claims of retaliation for taking leave arise under § 2615(a)(2) (opposing unlawful practices). *Yashenko*, 446 F.3d at 546, 551; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016). We have read that subsection broadly to protect not just employees who "oppose" unlawful practices, § 2615(a)(2), but also to protect "employees from discrimination or retaliation *for exercising their substantive rights under the FMLA*." *Yashenko*, 446 F.3d at 546 (emphasis added); *see also Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 810–12 (8th Cir. 2012). Not everyone agrees with our reading: Several of our sister circuits find these claims fall under § 2615(a)(1). *See, e.g.*, *Woods v. START Treatment & Recovery Ctrs, Inc.*, 864 F.3d 158, 166–67 (2d Cir. 2017). But we are generally bound by our prior panel decision in *Yashenko* absent contrary law from an en banc or Supreme Court decision. *See Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019).

Yet the Department of Labor issued regulations offering a different interpretation of § 2615(a) two years after our holding in *Yashenko* (but before cases following *Yashenko*, *see, e.g.*, *Sharif*, 841 F.3d at 203). That regulation suggests that claims for retaliation for

10

taking leave arise under § 2615(a)(1), not § 2615(a)(2). *See* 73 Fed. Reg. 67986 (Nov. 17, 2008) ("[T]he Act's prohibition on interference in 29 U.S.C. 2615(a)(1) includes claims that an employer has discriminated or retaliated against an employee for having exercised his or her FMLA rights."); *see also* 29 C.F.R. § 825.220(c) (2013).  And, under current Supreme Court precedent, a prior panel's interpretation of an ambiguous statute is not binding when the panel decision is overcome by an intervening, authoritative, and reasonable agency interpretation.  *See National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982–83 (2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."); *see also Palmetto Prince George Operating, LLC v. National Labor Relations Bd.*, 841 F.3d 211, 216–17 (4th Cir. 2016).  So this more recent regulation *might* require us, despite *Yashenko*, to find that retaliation-for-exercise claims fall under subsection (a)(1).  And, Fry argues, the regulation dictates that subsection (a)(1) claims require only negative-factor causation.  *See* 29 C.F.R. § 825.220(c) ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").[3]

---

[3] Our cases suggest that § 2615(a)(1)'s prohibition on interference is "prescriptive," meaning the employer's intent is irrelevant. *See, e.g.*, *Sharif*, 841 F.3d at 203. But Fry does not rely on those cases to argue that Rand's intent is irrelevant to her claim.

11

We need not resolve this issue here because Fry relies on the *McDonnell Douglas* framework to establish her claim.[4] Under that framework, she bears the "ultimate burden of persuading the court that she has been the victim of intentional retaliation." *Foster*, 787 F.3d at 252 (citations and internal marks omitted). To "carry this burden," Fry must "establish both that the employer's reason was false and that [retaliation] was the real reason for the challenged conduct." *Id.* (citations and internal marks omitted). And establishing that retaliation was the "real reason" is "functionally equivalent" to showing that Fry would have not been terminated "but for her employer's retaliatory animus." *Id.*[5] So, as we have held, "the *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause." *Id.*; *see also Diamond*, 416 F.3d at 318–20 (finding that a Title VII plaintiff who relies on *McDonnell Douglas* must put forward evidence of pretext to survive summary judgment).

Because Fry relies on the *McDonnell Douglas* framework and its pretext stage requires but-for causation, it does not matter which subsection of § 2615(a) the claim arises under. A plaintiff relying on the *McDonnell Douglas* framework must "put on sufficient evidence to allow a jury to find both retaliatory animus and pretext" to avoid judgment as

---

[4] Unlike the plaintiff in *Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020), Fry does not contend that the district court erred in using the *McDonnell Douglas* framework.

[5] Recently in *Hannah P.*, 916 F.3d at 348, we affirmed a grant of summary judgment on an FMLA retaliation claim. Though we cited the "negative factor" regulation, 29 C.F.R. § 825.220(c), as "relevant" to a subsection (a)(2) claim, we then held that the plaintiff failed to prove the "defendant's proffered reason is pretextual" by rebutting the defendant's "legitimate, nonretaliatory reason" under *McDonnell Douglas*. *Id.* at 347. So as our precedent stands, any plaintiff relying on burden shifting to establish an FMLA retaliation claim must establish pretext.

a matter of law in an FMLA case. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 296 (4th Cir. 2009).

And this is where Fry's case fell short.

### 2.  Fry failed to establish that Rand's reason for firing her was false and that retaliation was the real reason for her termination

The district court found that Fry failed to introduce sufficient evidence from which a reasonable jury could find Rand's proffered reason was false and a pretext for retaliation. We agree. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49 (2000) ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the probative value of the proof that the employer's explanation is false.").[6]

Rand presented a "lawful explanation" for firing Fry:  performance problems. *Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 429 (4th Cir. 2015). Extensive evidence showed that Fry failed to meet expectations—both before and after her FMLA leave. *See Sharif*, 841 F.3d at 204.  For example, in March 2016, Rabbitt emailed Fry, telling her that she was "very concerned . . . [a]bout [Fry's] performance," and that Fry's performance issues "ha[d] been building up ever since the [earlier] mix-up with a potential client," J.A. 1255, when Rabbitt and her colleagues arrived for a meeting and discovered that the meeting "didn't exist" because Fry had not confirmed it, J.A. 603.  At

---

[6] In reviewing a jury's verdict, whether the plaintiff properly made a prima facie showing is "no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).  But evidence supporting the plaintiff's prima facie case remains relevant in evaluating whether the proffered rationale was false and a pretext for retaliation. *Reeves*, 530 U.S. at 146.

13

trial, Fry testified that she remembered how Rabbitt "was quite upset. Very close to furious." J.A. 482. Rabbitt's email listed her concerns:

> Yesterday, I was hugely embarrassed that you hadn't done your job. I have to go to a dinner tonight NOT HAVING done my job . . . . because you sat on something for almost a month.
>
> I don't have a call-in number for an important call today.
>
> I have to edit too many emails . . . . correct too many mistakes.
>
> You have done many good things but it seems it is harder and harder for you to keep my very complicated schedule. I end up doing more and more myself. . . .
>
> You[r] attitude has been much better. It really has, but now you move slower, do less and make too many mistakes.
>
> You and I need to monitor this carefully.

J.A. 1255.

Between May 2016 and November 3, 2016, Rand documented more performance deficiencies. Fry failed to inform Rabbitt that a delivery for Rabbitt was not going to be made that day, failed to check Rabbitt's emails more carefully, failed to set up an online portal for Rabbitt that she had requested, and failed to give Rabbitt's driver Rabbitt's schedule. As for the latter, Rabbitt emailed both her driver and Fry in September 2016, informing them, "If you can't work out this simple activity, *both of your jobs may be in jeopardy*." J.A. 1263 (emphasis added).

And on November 3, 2016, Fry made a mistake that almost caused Rabbitt to miss an important meeting. Rabbitt complained about the mistake to Haglund: "I think Arlene blew it. If [s]he did, I need to replace her. She's making too many mistakes." J.A. 1264.

14

And Rabbitt confirmed that Fry indeed "had blown it." J.A. 617. Less than two weeks later, there was another scheduling mix-up on November 15, 2016. Rabbitt came into D.C. for an early meeting and learned when she got there that the meeting had been changed to a conference call, which Fry had failed to tell Rabbitt. That incident "[c]ompletely" confirmed Rabbitt's decision to end Fry's employment. J.A. 623.

These confrontations between Fry and Rabbitt about Fry's performance continued even after Fry returned from FMLA leave. For instance, on December 23, 2016, Rabbitt called Fry about an issue with a food delivery, blaming Fry for the problem. According to Fry, Rabbitt told her, "You cannot do anything right. You do this just to make me angry. You do it on purpose." J.A. 417.

Fry's evidence—taken in the light most favorable to her—was not enough to permit a reasonable jury to conclude that Rand's proffered rationale was false and merely a pretext for FMLA retaliation. Fry suggests that Rand's reason was false because Rand did not terminate her employment in November 2016, despite Rabbitt's concerns with Fry's many mistakes. In other words, if Rand was really motivated by her performance, and not the FMLA leave, then Rand would have fired her sooner.[7]

But an employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001). The evidence showed that Rabbitt at least

---

[7] As Rand did for every employee, Rand did give Fry a bonus in November 2016. And undisputed evidence at trial suggested that Fry was unhappy with the $1,500 she received, leading Rabbitt to explain that just because Fry had been here "another year" does not make her "more valuable." J.A. 342, 1125.

"contemplated" firing Fry before she took leave. *Id.* So, even if the decision was only "definitively determined" after the leave, that timing "is no evidence whatever" that the leave was the real reason for the firing. *Id.*; *see also* J.A. 212 (explaining that, "typically, Rand's practice is not to terminate employees during holidays or year-end").

Though Rand had contemplated firing Fry for her performance problems, Rand readily approved Fry's request to take FMLA leave with no indication of hostility. *See Sharif*, 841 F.3d at 205. Fry testified that, when she told Rabbitt about her multiple sclerosis, Rabbitt was "'sorry to hear this'" and said, "'I'm going to leave you with [Bazyluk] who is going to explain your benefits to you.'" J.A. 455. The next day, when Fry told Haglund that she needed to take leave, Haglund "[c]ouldn't have been more gracious or concerned," telling her to take "[w]hatever [she] need[ed]." J.A. 458. Fry also testified that, when she informed Bazyluk that it would be difficult to get her doctor to complete the FMLA paperwork because it was almost Thanksgiving, "[Bazyluk] was very nice and she said, 'That's not a problem. That's fine.'" J.A. 459.

Fry points to comments made by Rabbitt after Fry returned from leave. At one point, Rabbitt accused her of returning from a "two week cruise." J.A. 412, 418. And Rabbitt expressed frustration with the effect of Fry's illness. November was the beginning of "the busiest time of the year" for Rabbitt. J.A. 212. And Fry's leave, combined with the uncertainty, added to her stress. When Fry returned to Rand on December 12, Rabbitt met with her to discuss how they would work together, saying, "I want to know what this . . . thing means. I want to know what it means. I want to know how it is going to affect my life." J.A. 404. But these comments are not enough to show that Fry's well-

16

documented performance issues were pretext for Rand's retaliation. *See Reeves*, 530 U.S. at 148–49. Rabbitt often expressed her dissatisfaction with Fry's performance over several months *before* Fry took FMLA leave. If anything, Fry's leave "just delayed the inevitable," J.A. 213—that Rabbitt would terminate Fry's employment because of her performance issues.

Fry disagrees with Rand's assessment of Fry's performance. But that disagreement does not provide a legally sufficient basis for a reasonable jury to conclude Rand's problem with Fry's performance was pretextual. It is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (cleaned up). And here the decision maker was Rabbitt, Rand's Chief Executive Officer. J.A. 335. *See also Laing*, 703 F.3d at 722 ("[A]ll [the plaintiff] has proven is the unexceptional fact that she disagrees with the outcome . . . But such disagreement does not prove that [the defendant's] decision to fire her . . . was 'dishonest or not the real reason for her termination.'") (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). The FMLA does not prevent "an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 304–05 (4th Cir. 2016). And it is not the courts' place to determine whether Rand's assessment of Fry's performance issues was "'wise, fair, or even correct, so long as it truly was the reason for [her] termination.'" *Laing*, 703 F.3d at 722 (citing *Hawkins*, 203 F.3d at 279). The FMLA does not require "an employer to retain an employee on FMLA leave when the employer would not have

17

retained the employee had the employee not been on FMLA leave." *Throneberry v. McGehee Desha County Hospital*, 403 F.3d 972, 977 (8th Cir. 2005).

We therefore conclude that Fry did not provide sufficient evidence to show Rand's proffered nonretaliatory reason for terminating Fry's employment—poor performance— was false and a pretext for retaliation. So we affirm the district court's judgment as a matter of law on Fry's FMLA retaliation claim.

### 3. The court did not abuse its discretion by excluding a former employee's testimony under Rule 403

Fry also argues that the district court erred in barring testimony by Susan Boyle, a former Rand employee. Fry offered Boyle's testimony to show Rabbitt's discriminatory intent. Boyle would have testified that, more than a decade ago, she was fired after taking non-FMLA leave for six weeks after a neck surgery.

The district court excluded Boyle's testimony under Federal Rule of Evidence 403, which permits a district court to exclude evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . ." Fed. R. Evid. 403. We review this ruling for an abuse of discretion. *Roe v. Howard*, 917 F.3d 229, 239 (4th Cir. 2019); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 161 (4th Cir. 2012).

The district court did not abuse its discretion by excluding this evidence. As the Supreme Court explained in *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379 (2008), whether testimony of separate instances of discrimination is relevant "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances

18

and theory of the case." *Id.* at 388; *see also Griffin v. Finkbeiner*, 689 F.3d 584, 599 (6th Cir. 2012). Here, the district court found that Boyle's alleged discrimination was not "'close in time'" to Fry's and that the circumstances were "markedly different." J.A. 120. Boyle suffered a neck injury that required her to take six weeks off to recover in 2008. And Boyle did not take statutory FMLA leave; she instead relied on Rand's leave policies. Fry, on the other hand, had multiple sclerosis and took qualifying FMLA leave. So the district court found that the evidence, ultimately, had little probative value.

On the other hand, the district court found that there was uncertainty about whether Boyle's termination was unlawful. So, if Boyle testified at trial, there was a risk of "confus[ing] the issues for the jury and unnecessarily lengthen[ing] this case by creating a 'trial within a trial.'" J.A. 121. The district court also explained that "any probative value that Boyle's termination in 2008 has with respect to Rand's intent as to Fry in 2016 is substantially outweighed by the unfair prejudice that would attend that evidence." *Id.* Boyle's testimony, according to the district court, tends to showcase a prior bad act in an impermissible way: the jury would likely understand Boyle's experience "as evidence of Rabbitt's general disposition against those with disabilities or those who take leave." *Id.* And the court determined this kind of inference risked the type of prejudice envisioned by Federal Rule of Evidence 404(a). *Id.*; *see also* Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").

We find that the district court properly conducted its balancing under Rule 403 in a nuanced and particularized manner. *See* J.A. 118–21 (four pages addressing Boyle's

19

testimony). Given the district court's "wide discretion" under Rule 403, *United States v. Abel*, 469 U.S. 45, 54 (1984), we find that the district court did not abuse its discretion in excluding Boyle's testimony.

*        *        *

A jury's verdict is entitled to great respect. But the district court must still perform its duty to grant judgment as a matter of law when it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Here, the district court properly held that Fry failed to provide a sufficient evidentiary basis for a reasonable jury to find that Rand's reliance on Fry's performance problems was merely pretext. So the district court's judgment is

*AFFIRMED.*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The evidence introduced at trial in this case did not compel the jury's verdict that Rand Construction Corporation ("Rand" or "the Corporation") terminated Arlene Fry for exercising her rights under the Family and Medical Leave Act (FMLA). But that evidence did provide a sufficient basis for the verdict. Accordingly, I dissent from the majority's contrary holding.

Central to my disagreement with the majority is the fact that a trial court's role as finder of fact differs markedly from its role in deciding a motion for judgment as a matter of law, which may nullify a jury verdict. As factfinder, the trial court determines whether the plaintiff has prevailed on her claim, employing, in the usual civil case like this one, a preponderance of the evidence standard. *See Verisign, Inc. v. XYZ.com LLC*, 891 F.3d 481, 485 (4th Cir. 2018); *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). But a court may grant judgment as a matter of law, upending a jury verdict, "only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, . . . the *only* conclusion a reasonable jury could have reached is one in favor of the moving party." *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008) (emphasis added).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Consequently, we must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. A

21

court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted). "If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489–90 (4th Cir. 2005).

In this case, "the evidence as a whole is susceptible of more than one reasonable inference." *Id.* Rand's theory of the case was that the decision to terminate Fry's employment was made *prior* to her exercising her FMLA rights. The Corporation relies on a November 3, 2016, email authored by its Chief Executive Officer — for whom Fry worked as an executive assistant — stating that she would need to replace Fry if Fry "blew it" on a particular assignment. The jury need not have concluded from this email that the CEO had made a decision to terminate Fry's employment at that time. In fact, shortly after the email was sent, the Chief Operating Officer reassured Fry: "[The CEO] is just angry. She's just upset."

The Corporation also relies on the Human Resources Director's testimony that after meeting with the CEO on November 4, 2016, about the list of Fry's attributes, her understanding was that Fry's employment would be terminated. The jury did not have to draw this inference. The list contains no reference to termination, nor did the Rand HR Director testify that she discussed termination with the CEO at that point. Similarly, although the Rand CEO testified that the November 15 incident "confirmed" her decision to fire Fry, the jury was not required to credit the CEO's self-serving testimony. Contrary

22

to the majority's depiction, the trial transcript does not reflect that the CEO herself "reconfirmed" Fry's termination during her conversation with the HR Director. And the COO's January 6 letter is consistent with Fry's account that prior to her FMLA complaints, the Corporation had only been *proposing* a transition plan that, if accepted, would involve her leaving the company the following summer.

Moreover, even if the Corporation could have terminated Fry due to poor performance, this does not mean that it would have done so absent Fry's protected activity. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016) ("[B]ecause Fairview has shown it could operate without Guessous does not mean that it would have done so absent the protected activity. Guessous' burden is only to show that the protected activity was a but-for cause of her termination, not that it was the sole cause."). Fry did not have to prove that her performance was satisfactory to her employer. She only needed to prove that, notwithstanding her performance issues, her termination was "*more likely* the result of retaliation." *See Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (emphasis added).

Based on the evidence introduced at trial, a reasonable jury could find that Fry's termination was "more likely the result of retaliation." *Id.* Fry offered evidence that her FMLA leave affected the CEO's assessment of her performance. Shortly before Fry took FMLA leave, the Rand CEO awarded her a $1,500 year-end bonus. The CEO acknowledged that Fry "showed up every day for work" from 2009 through November 2016 (the month that Fry took FMLA leave); only thereafter, according to the CEO, did Fry's attendance become "unpredictable." When Fry explained that she had been on

23

medical leave, the CEO replied: "You were on a cruise. You were on a God damn cruise."

Shortly thereafter, the Rand COO and HR Director proposed a transition agreement to Fry that, if accepted, would result in Fry leaving the company the following summer.

Less than a month later, Fry complained to Rand that her FMLA rights were being violated. She sent a second complaint on February 2, 2017; the company terminated her the following day. The Rand COO agreed that Fry's February 2 complaint was "the straw that broke the camel's back." According to the COO: "We tried to work with her, trying to figure out what was really going on. And then at this point she was calling us liars." Of course, the COO also testified that the decision to terminate Fry's employment ultimately rested with the CEO. But the COO's testimony suggests that Rand management viewed the February 2 complaint as crucial to the decision to fire Fry. The close temporal proximity between the complaint and Fry's termination the following day buttresses this inference. Viewing all of the evidence in the light most favorable to Fry and drawing every legitimate inference in her favor, a reasonable jury could find that Fry was terminated for exercising her FMLA rights.

To be sure, the evidence introduced at trial would have *permitted* the jury to believe that in terminating Fry, the Corporation was "proceeding along lines previously contemplated." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). But judgment as a matter of law is not warranted unless "the *only* conclusion a reasonable jury could have reached is one in favor of the moving party." *Saunders*, 526 F.3d at 147 (emphasis added). In this case, the jury was entitled to believe that Fry's protected activity was the straw that

24

broke the camel's back — the extra push that moved the Corporation from dissatisfaction with Fry to a decision to terminate.

I respectfully dissent.